AUG. TERM, 1842.

THE STATE, TO THE USE OF WARBURTON & KING v. WOODS AND OTHERS.

The State, to the use of Warburton & King, v. Woods and others.

1. A sheriff will not be liable for an escape, under the fifty-second section of the act concerning executions, (R. C. 1835, p. 260,) if, at the time of the escape, he is deviating from the line of his duty, at the request of the plaintiff, or his agent, as taking the defendant to some particular place for the purpose of obtaining security for part of the debt, even if the prisoner escape by the negligence of the sheriff.

2. If there is any evidence given from which the jury might infer a particular fact, its sufficiency to establish such fact must be determined by the jury.

Appeal from the Circuit Court of Morgan county.

HAYDEN for Appellant.

WILSON AND MILLER for Appellees.

*Opinion of the Court, delivered by Tompkins, Judge.*[*]

This was an action of debt, brought by the State, to the use of Warburton and King against Woods, and others, his securities on his official bond as sheriff of that county. Judgment was given in the circuit court against the State, suing to the use of, &c., and to reverse that judgment this appeal is prosecuted.

The breach assigned is, that Warburton and King having delivered to said Woods, sheriff as aforesaid, an execution issued by the clerk of the circuit court of Boone county, on a judgment obtained in that court against one John G. Brewster, by said Warburton and King, and Woods having taken said Brewster on said execution, suffered him to escape. On the trial of the cause, the delivery of the execution to Woods being proved, the witness who delivered it, further proved on the part of the plaintiffs, that he delivered the execution to Woods at his own house, and told him that he wanted it immediately attended to; that he wished to be present when Brewster was taken; that in a few hours he and Woods

_____
*Judge Napton did not sit during the trial of this cause.

set out to the mouth of the Gravois, where it was ex- AUG. TERM, 1842.
pected to find Brewster, and there found him ; that before
they found Brewster, the witness had told Woods that he The State,
learned from Warburton and King that Brewster was not to the use of Warburton &
to be trusted, and that he wished to be present when King, v. Woods and
Brewster was taken, in order to make some arrangement others.
in case he was not able to pay, and that he was agent of
the plaintiffs in the execution ; that he several times told
the sheriff, Woods, that he had no confidence in Brews-
ter, and that Brewster, if he discovered their business,
would make his escape ; that having found Brewster at
the mouth of the Gravois, Woods served the execution
on him, and asked him for property of several kinds, and
that Brewster denied having any ; Woods then took him,
and told him to consider himself his prisoner ; that Brews-
ter having learned from the witness that he was the agent
of the plaintiffs, desired to speak with him.  Witness and
Brewster walked off some distance together down a hill,
and out of sight of the sheriff, and Brewster made some
indefinite propositions about the debt, saying something
about giving security for half of it, that the witness and
Brewster then returned to a grocery where they had left
the sheriff, and there found him.  Woods mentioned that
he must go over the Gravois to Miningport, to collect
money on a merchant's license.  The witness said he
would go along to see the site of Miningport, of which
he had heard much talk.  They started to go, and the
sheriff asked Brewster if he could set them over. Brews-
ter got into the canoe, walked to the stern and sat down.
Woods got in next, and sat near the middle—wit-
ness got in last, and sat near the bow.  Brewster
paddled across the Gravois, the river being higher than
usual.  When they reached the opposite shore of the
Gravois the witness got out first, Woods next, and then
they walked along near each other in the direction of the
store house, the witness foremost.  When they had walk-
ed some thirty or forty yards, witness, hearing a noise,
turned and saw Brewster in the water shoving the ca-
noe out into the stream, and told Woods.  Woods turned,
46*

AUG. TERM,
1842.

The State,
to the use of
Warburton &
King, v.
Woods and
others.

and advancing a few steps towards the canoe, called to Brewster, asking if he intended to serve him so. Brewster answered, swearing that he would not go to jail.—Brewster continued to paddle briskly down the Gravois, and as he was going, called to the witness, requesting him to stay in the neighborhood that evening, and that he would see him. Whilst Brewster was making his escape down the river, the sheriff called to some men near the grocery, telling them that he summoned them to take that man. Brewster made his escape into the Osage river, and went down it. The witness denied that he assented to the escape of Brewster, or that he was either directed or requested to take charge of the prisoner. This witness's name is Vaughn.

The defendant then introduced a witness named Hicks, who stated that he was at the grocery on the day that Vaughn and Woods came, when Brewster was arrested on the execution; that he heard Brewster ask Vaughn if he was agent of Warburton and King, and desired a conversation with him. On being informed that he was agent, Hicks states, that Vaughn and Brewster walked off under the hill, about twenty paces, or there about; the witness heard Brewster and Vaughn in conversation on the subject of the debt for which the execution was issued, and believes he heard Brewster tell Vaughn that he thought he could give one Seth Howard as security for the debt, if Vaughn would take him; and after Brewster and Vaughn had remained absent at the above mentioned place a few minutes in conversation, they returned back into the presence of the sheriff at the grocery, and the witness then heard Brewster, Vaughn, and Woods in conversation with each other upon the subject of the claim, and that it was the understanding that if Brewster could and would give said Howard as security for the debt, that it would be satisfactory to Vaughn, and it was agreed on all hands that they, Brewster, Woods, and Vaughn, would go and see Howard, to know whether he would go security; that as Woods had business in Miningport, and Vaughn wished to see it, they all agreed

to go over. After it was agreed by Brewster, Woods, and Vaughn, as above stated, to see Howard, Woods called over to Fisher, to come from Miningport to the grocery; Woods had declined going over, and afterwards went over.

This witness, on cross examination, stated that he did not hear either Vaughn direct the sheriff to discharge Brewster from custody, or the sheriff direct Vaughn to assist in guarding Brewster; that when it was determined to go over to Miningport, there were several canoes at the bank, one of which only could be used, the others being filled with rock, and having no oars or paddles belonging to them. They entered the canoe and got out after crossing, according to this witness, as the other states, except that after Vaughn and Woods "had stepped a few paces on the bank, a distance, he thinks, not more than four or five paces, that Brewster followed on after until he got to the bow of the canoe, when he put one foot upon the bank, and made a sudden and violent shove, and run the canoe back into the creek, and then he fell to work with his paddle, and paddled his canoe into the middle of the channel of the Osage river, and made his escape down the river."

About the time Brewster was pushing off from the shore, the witness further stated, Woods called over to the witness and others on the opposite side of the creek to arrest Brewster, but they had no vessel in which to pursue him.

The defendants also introduced another witness named Gist, who testified to the same facts that Hicks did.

This being all the evidence, the plaintiff asked eight instructions of the court. The court gave all except the second, third, and eighth. The amount of the five given, so far as is material to be here noticed, is that the sheriff, after he arrested Brewster was bound to keep him with due diligence, and not to permit him to go at large, and that the witness, unless commanded by the sheriff to guard Brewster, was under no obligation to do it. The instructions refused were:

AUG. TERM.
1842.

The State,
to the use of
Warburton &
King, v.
Woods and
others.

2. That in this case there is evidence that the sheriff permitted the prisoner, Brewster, to make his escape from his custody.

3. That there is no evidence in the cause conducing to show that Woods, after he took Brewster into custody, used any reasonable means within his power to keep Brewster safely in his custody.

8. That in this case the defendants have given no evidence going to show that he, Woods, was not guilty of a negligent escape in permitting Brewster to escape.

The court, on the motion of the defendant, gave these instructions :

1. If they believed from the testimony, that Vaughn had as much authority over the execution as the plaintiffs in the execution would have had, had they been personally present, and that the escape grew out of the interference of Vaughn with the prisoner in order to secure the debt, then they must find for the defendants.

2. That if they believe from the evidence, that Vaughn had power to release Brewster from the execution, and that the prisoner was carried out of the course to the jail, at his instance, to make an arrangement to secure the debt, and that the escape took place in consequence of this arrangement, then they must find for the defendants.

Verdict being found for the defendants, the plaintiff moved the court for a new trial, because, First, the court refused to give the plaintiff's second, third, and eighth instructions, and because the court gave the instructions asked by the defendant.

Third, the verdict was against law, &c.

The correctness of the conduct of the circuit court, in refusing to give the instructions asked by the plaintiff, is to be tested by the correctness of its conduct in giving the two instructions asked by the defendants. Vaughn, the witness on the part of of the plaintiff, had testified that he told the sheriff that Brewster was not to be trusted, and that he wished to be present when Brewster was taken, in order to make some arrangement in case he was unable to pay,

and that he was agent of the plaintiffs in the execution. He also testified that he had a conversation with Brewster apart from the sheriff after Brewster was taken, and that Brewster made some indefinite proposition about the debt, saying something about giving security for half of it, and leaves us to draw our own conclusion as to his acceptation of these propositions. Hardin Hicks, a witness examined on the part of the defendant, states that he was not far distant and heard this conversation between Brewster and Vaughn, and he stated that he thought he heard Brewster tell Vaughn that he thought he could give one Seth Howard as security for the debt, if Vaughn would take him ; that in a short time Brewster and Vaughn returned to the sheriff, and it was agreed that Woods, Brewster and Vaughn would go and see Howard, to know whether he would go security. Another witness corroborates Hicks' evidence. Whether Howard lived in Miningport, and it was part of their business in that place to see him, does not appear from the testimony, nor in my opinion is it material.

The State, to the use of Warburton & King, v. Woods and others.

The jury were told by the circuit court that if they believed Vaughn was in this affair agent for the plaintiffs, and that the escape grew out of his interference with the prisoner in order to secure the debt, they must find for the defendants. They could not but have believed the two witnesses who testified that Vaughn had agreed to go to see Seth Howard ; for Vaughn himself did not say any thing that could induce a different belief. By his interference, the risk then of escape was increased. Whether, then, Seth Howard lived at Miningport, and they were going to that place to see him, or they were to go to that place first, and after their return, were to see Howard, is immaterial, inasmuch as Vaughn agreed to the whole arrangement.

A sheriff will not be liable for an escape, under the 52d section of the act concerning executions (R. C. 1835, p. 260,) if, at the time of the escape, he is deviating from the line of his duty, at the request of the plaintiff, or his agent, as taking the defendant to some particular place, for the purpose of obtaining security for part of the debt, even if the prisoner escape by the negligence of the sheriff.

The risk, then, being increased with Vaughn's consent, the jury had an undoubted right to find that the escape grew out of the interference of Vaughn with the prisoner to secure the debt. It was the right of the sheriff to take the prisoner to jail immediately after the arrest ; and moreover, it was a duty he owed equally to himself and to his securities, and if the plaintiffs in the execution, by their agent, were not content to wait, to make their arrangement to se-

If there is any evidence given from which

AUG. TERM.
1842.

The State,
to the use of
Warburton &
King, v.
Woods and
others.

the jury might
infer a parti-
cular fact, its
sufficiency to
establish such
fact must be
determined by
the jury.

cure their debt, until the prisoner was lodged in jail, they certainly ought not to be indulged in their humor at the risk and cost of the defendants in this action.

The instructions asked by the plaintiffs, called on the court to usurp the province of the jury, since there was evi-dence given from which the jury might have inferred, and must have inferred, that the escape of the prisoner was the consequence of the interference of Vaughn, the plaintiff's agent. The evidence of Vaughn differed from that of the other witnesses as to the degree of diligence used by the sheriff. He states that Brewster did not shove the canoe from the shore till he and Woods had walked some thirty or forty yards from the canoe. The other witnesses stated, that they had not advanced more than four or five paces from the bank of the creek, when Brewster, advancing to the bow of the canoe, put one foot on the bank, and making a sudden and violent *shove* pushed the canoe into the middle of the creek: and this is the most probable account, for why should he wait so long? It required but an instant to get into the water out of their reach, and the sooner it was done, the less risk he ran of being prevented. It is in vain that Vaughn says he was not commanded to watch the pri-soner, &c. It is in evidence, that he assented to this request of the prisoner, and, indeed, desired the prisoner to be ta-ken to Seth Howard's, to try and find security for the debt; and the jury finding for the defendants, on the instructions given, must have believed that the escape took place in con-sequence of the interference of the plaintiff's agent. Had the sheriff been left to himself, he would have been answer-able on his bond for the escape of Brewster; but if the plaintiffs, through their agent, Vaughn, will ask of him to perform a duty not belonging to his office as sheriff, and in deviating from the line of his duty prescribed by law, (which was to take the prisoner directly to jail,) the prisoner escape either by accident or negligence, the sheriff cannot be made answerable on his official bond. For it then becomes a mat-ter of special agreement between the parties. The law makes no provision for such cases, and the sheriff's securi-ties could not have contemplated any liability in such a case,

The Judgment of the circuit court ought in my opinion <span>AUG. TERM.</span>
to be affirmed, and judge Scott concurring, it is affirmed. <span>1842.</span>